### KARL ROVE & CO.

v.

### Richard THORNBURGH, Raymond P. Dimuzio, and the Thornburgh for Senate Committee.

### Civ. No. A 92 CA 266–SS.

United States District Court, W.D. Texas, Austin Division.

June 16, 1993.

---

David Herndon, G. Michael Lawrence, Graves, Dougherty, Hearon & Moody, Austin, TX, for plaintiff Karl Rove & Co.

Jon David Ivey, J. Paige Bickley, Lindsay Lee Lambert, James C. Winston, Houston, TX, for defendants Richard Thornburgh, Raymond P. Dimuzio, The Thornburgh for Senate Committee.

## MEMORANDUM OPINION AND ORDER

SPARKS, District Judge.

The primary issue before the Court in the above-styled and numbered cause is whether or not Richard Thornburgh, a former candidate for the United States Senate, and/or Raymond P. Dimuzio, treasurer of Thornburgh's designated principal campaign committee, may be held liable for a contract debt incurred by the principal campaign committee.

This case was tried before the Court, without a jury, on April 1 and 2, 1993. All parties were present and represented by counsel. Having carefully considered the evidence presented at trial, the arguments of counsel, and the extensive briefing in this cause, the Court concludes the Thornburgh for Senate Committee and Richard Thornburgh are liable for the Committee's debt to Karl Rove & Company. Raymond Dimuzio, however, is not personally liable.

## I. PROCEDURAL BACKGROUND

Plaintiff, Karl Rove & Company, a Texas corporation with its principal place of business in Austin, Texas, originally filed suit against Defendants on March 30, 1992, in the 353rd Judicial District Court of Travis County, Austin, Texas. On May 1, 1992, Defendants, Richard Thornburgh ("Thornburgh"), a resident of Washington, D.C.; Raymond P. Dimuzio ("Dimuzio"), a resident of Pittsburgh, Pennsylvania; and The Thornburgh for Senate Committee ("the Committee"), an unincorporated association organized pursuant to the Federal Election Campaign Act and located in the State of Pennsylvania, removed the case to this Court pursuant to 28 U.S.C. § 1441. On October 23, 1992, Rove filed a First Amended Complaint, which states causes of action for breach of contract or, in the alternative, quantum meruit and fraud and theft of services. Also on October 23, 1992, Defendants filed counterclaims, which assert causes of action for statutory usury, common law usury, and violation of the Texas Deceptive Trade Practices—

Consumer Protection Act ("DTPA"). All parties have requested attorneys' fees.

Construing Defendants' special appearances made in state court as motions to dismiss, the Court denied each of the Defendants' motions to dismiss, but instructed them they were free to argue lack of personal jurisdiction at trial. The Court also declined to rule on Plaintiff's motion for summary judgment until the time of trial, and, at that time, denied the motion as there are clearly material factual disputes with respect to Rove's claims against each Defendant.

## II. FACTS

### A. Pre–"Official" Campaign Events

Karl Rove ("Rove") is President of Karl Rove & Company ("Rove & Co.") and is very familiar with the organization and operation of political campaigns. Rove has been involved in politics since 1968 and has provided direct mail fund-raising services to candidates in 31 states and one foreign country since 1981. Rove & Co. prepares individualized solicitation letters for candidates; provides the artwork for those letters; mails the letters to targeted persons; and analyzes the responses to the mailings for use in future mailings and campaigns. As an experienced fund-raiser for political campaigns, Rove understands the uncertainty surrounding most elections and the risks involved in dealing with a campaign committee without obtaining separate guarantees for payment.

In June, 1991, Defendant Richard Thornburgh, then Attorney General of the United States, began considering running for the office of United States Senator from the State of Pennsylvania, following the April, 1991, death of Senator John Heinz. On June 5, 1991, Thornburgh advised President Bush, Senator Gramm, Senator Dole, and his family and close friends he intended to run for the vacant Senate position.

In the early summer of 1991, Rove telephoned Murray Dickman, then Assistant to Attorney General Thornburgh in Washington, D.C. to express his interest in providing direct mail fund-raising services to Thornburgh in the event he ran for Senator.[1] Rove called Dickman because he knew Dickman had been Thornburgh's political advisor, administrative assistant, and the person primarily in control of Thornburgh's previous campaigns. Rove also knew the Republican Senatorial Committee was very involved in the consideration of Thornburgh as the Republican candidate for the vacant Senate seat and communicated with one of its members, Carla Eudy, as well as Dickman. Eudy recommended Dickman use Rove. On June 10, 1991, the United States District Court for the Eastern District of Pennsylvania ruled Pennsylvania's special election statute unconstitutional, and enjoined the November special election for the vacant Senate seat. See *Trinsey v. Commonwealth of Pa., Dep't of State Bd. of Elections,* 766 F.Supp. 1338 (E.D.Pa.1991). Two weeks later on June 24, 1991, despite the fact the election was officially "off", Rove sent his "Direct Mail Proposal for the Thornburgh for Senate Campaign" ("the Proposal") to Eudy and Dickman. On July 1 or 2, 1991, Dickman called Rove and said the Proposal looks "great"; "let's get going," and indicated they should be ready to move in August. Testimony of Karl Rove; *see also* Plaintiff's Exhibit # 10 (memorandum from Bob Mason to Murray Dickman, Michele Davis, and Ray Dimuzio, stating, "Carla's recollection is that Murray reviewed and approved of the Rove proposal"). However, Dickman told Rove the executing of the contract would need to wait until the campaign officially began.

In response to Dickman's inquiry as to what steps needed to take place prior to the actual start of the campaign and execution of a contract, Rove told Dickman he would need to locate a reciprocal post office; he would need Thornburgh's political donors' list, a collection of Thornburgh's speeches, personal letters, previous campaign materials, Thornburgh's signature; and he would need to know Thornburgh's favorite colors (for use in the mailings). Dickman personally obtained and federal expressed to Rove Thornburgh's

---

**1.** Karl Rove provided the direct mail fund-raising services for Senator Heinz's campaigns in 1987 and 1988.

signature exemplar, Thornburgh's donors' list; and Thornburgh's personal list of mailing addresses. Dickman also advised Rove that Thornburgh wanted the letterhead on solicitation letters to read "Dick Thornburgh."

On August 6, 1991, the Third Circuit Court of Appeals reversed the District Court's June 10, 1991 decision and held the Pennsylvania statute for filling vacant U.S. Senate seats constitutional, thus reinstating the November, 1991 election. *See Trinsey v. Commonwealth of Pa.*, 941 F.2d 224 (3d Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 658, 116 L.Ed.2d 750 (1991). Rove & Co. immediately had its attorneys prepare a draft agreement between Rove and the Thornburgh for Senate Committee. *See* Plaintiff's Exhibit 4 (Proposed Agreement between Rove and the Committee). This draft incorporated the terms of the June 24 Proposal, but was more specific than the Proposal and raised the monthly charge from $1500.00 to $2000.00 as the original proposal anticipated a four, not three, month campaign. *See* Plaintiff's Exhibit 66 (June 24, 1991 Proposal and August 7, 1991 Proposed Agreement).

According to the August 7 Proposed Agreement, in addition to the monthly charge of $2000.00, the Committee would pay Rove's expenses in connection with the direct mail campaign, the Committee would pay Rove 4.5 cents per fund-raising letter and 3.0 cents per each other letter sent to voters, and Rove would retain any industry discount up to 15% of the gross price. *Id.* In the event payments due were not paid on time, interest at the rate of 18% per annum, or the highest legal rate, whichever was lower, would be charged. *Id.* And, in the event a lawsuit was filed, the prevailing party would be "entitled to recover its reasonable attorney's fees." *Id.* The Agreement further provided it was "made, [would] be performed, and [would] be construed in accordance with the laws of the State of Texas...." *Id.*

However, the Proposed Agreement left blank who the Committee's designated representatives would be and left blank who was to sign on the signature line under "Thornburgh for Senate Committee." *See id.* Rove did not request, at this time or any time thereafter, a guaranty of payment from Thornburgh or any other person.

This Proposed Agreement was apparently never formally executed by Thornburgh, Dickman, Dimuzio, or a representative for the Thornburgh for Senate Committee. However, no disagreement of the terms were advised, and the parties conducted business according to those terms.

In anticipation of Thornburgh's official entry into the Senate race, Rove began preparing, and completed, the first solicitation letter long before Thornburgh filed his statement of candidacy on August 16, 1991 or announced publicly his candidacy on August 29, 1991. On August 15 or 16, 1991,[2] Rove mailed the first batch of letters soliciting donations on behalf of Thornburgh's candidacy for Senator. *See* Note 2, *supra.* Prior to doing so, Rove sent a draft of this first letter to Dickman. Dickman, in turn, gave the letter to Thornburgh, who reviewed the letter for factual errors and sent the draft containing *his* changes back to Rove by way of Dickman. Thornburgh testified this was done at his request so that he could "protect his reputation." He further testified he reviewed letters before they were mailed on other occasions.

### B. Post—"Official" Campaign Events

On August 15, 1991, Rove resigned as United States Attorney General. On August 16, 1991, he filed his Statement of Candidacy and designation of the Thornburgh for Senate Committee as his principal campaign committee with the Federal Election Commission, pursuant to Section 432, subsection (e), Title 2, United States Code. *See* Plaintiff's Exhibit 2A; 2 U.S.C. § 432(e); 11

---

**2.** Rove testified the first letter was mailed on August 15, 1991. However, Plaintiff's Exhibit 71, refers to the first letter as the "Kickoff Letter" of August 16, 1991. A prebill invoice was submitted to the Thornburgh for Senate Committee "c/o Murray Dickman" on August 15, 1991, which also indicates the letter was probably mailed on August 16, 1991. *See* Plaintiff's Exhibit 83f. In any case, Rove clearly performed a substantial amount of work on behalf of Thornburgh and/or the Committee prior to the time Thornburgh became an official candidate and designated the Committee as his principal campaign committee.

C.F.R. § 101.1 (1992). The Committee, although permitted under the law, was not incorporated then or at any time subsequent to its formation. *See* 11 C.F.R. § 114.12 (1992).

Thornburgh, although he did not know Raymond P. Dimuzio personally, approved of and listed Dimuzio as Treasurer of the Committee, as Federal law requires every principal campaign committee have a treasurer.[3] *See* Plaintiff's Exhibit 2A; 2 U.S.C. § 432(a); 11 C.F.R. § 102.7. Dimuzio's sole responsibilities as treasurer were to assure compliance with Federal regulations and to develop and implement internal procedures for disbursements and documentation of funds. Bob Mason and Michele Davis reviewed and approved or denied requests for disbursements of Committee funds. Once approved, only Dimuzio and Evans Rose, Finance Chairman, could actually sign the Committee's checks. Dimuzio only authorized three transactions regarding Rove & Co.: a request for, and payment to, Rove for stationary; a request for, and payment to, Rove for "the Thanksgiving" debt retirement letter; and the payment of $50,000 made after the election because Dimuzio knew Rove was entitled to some money and the Committee had already been disbanded. Dimuzio did not take part in the hiring of Rove; did not see the June 24, 1991 Proposal, August 7, 1991 Proposed Agreement, or September 18, 1991 Contract, despite repeated requests that he be given a copy of the contract; and

did not assume any personal liability for the debts of the Committee.

On August 22, 1991, Dickman hired Bob Mason as Director of Finance and told him Rove & Co. had already been retained as the provider of direct mail services.[4] According to Thornburgh, the Committee "hired" Michele Davis as Campaign Manager[5] and "hired" Murray Dickman, who testified he had no specific title but is listed by Defendants as "media representative" in their post trial brief. *See* Defendants' Post Trial Brief, at 6 (April 21, 1993).[6]

Thornburgh testified he did not know who was on the Committee, did not select or approve its "members",[7] and did not know who had authority to act for the Committee. He further testified he was not familiar with the inner workings of the Committee, was not involved in the managing of the Committee's finances, did not know how the Committee spent its funds, and played no part in the selection of vendors, including Rove, hired by the Committee.

The Court finds this testimony lacks credibility. Thornburgh is a very experienced and intelligent politician with intimate knowledge of the inner workings of political campaigns. Thornburgh knew one, if not the primary, source for campaign funds would be donations received in response to fund-raising letters. In this case, Rove raised over $750,000.00 total, and over $425,000.00 net, which money all went to further Thornburgh's campaign. Thornburgh's testimony that he did not "personally" benefit from the

---

3. One of Dimuzio's business partners, who had previously acted as Thornburgh's treasurer in earlier Pennsylvania elections but was unable to do so that summer, personally recommended Dimuzio to Thornburgh. Upon Dimuzio's appointment as treasurer, Rove was instructed to speak with Dimuzio, presumably about the submission of invoices and receipt of payments.

4. At the time Murray Dickman and Carla Eudy approached him for the position of Finance Director, Bob Mason was working for the National Republican Senatorial Committee, which he returned to in November, 1991, following the election.

5. Dickman testified he was involved in the hiring of Michele Davis, whom Thornburgh had worked with in the past, and that Thornburgh knew Davis was being considered for the position of

campaign manager but did not take an active role in that decision.

6. Another key figure in the campaign was Finance Chairman Evans Rose, who had been in charge of Thornburgh's finances in three former campaigns and, according to Dickman, "was a given" for the position.

7. Dickman, on this subject, testified there were *no* members of the Committee, other than its treasurer Dimuzio. If indeed there were no members, this only further supports this Court's conclusion that Dickman was the person calling the shots in Thornburgh's campaign. In either case, the law provides for personal liability if a member *or* officer *or* candidate authorizes, assents to, or ratifies a committee transaction. *See* Section III.C., at 674, *infra*.

Committee's receipt of this money is equally not credible. The money was used for the sole purpose of seeking his election to an office whereupon he would enjoy the accompanying prestige and salary. Remaining money in the Committee fund would have been restricted for use in his future campaigns or payment of certain expenses associated with his public office. *See* 11 C.F.R. §§ 113.2, 113.3 (1992). To say this did not personally benefit him is merely semantics.

Furthermore, there is no way a man of his intellect—a man who was entrusted with the governorship of his home state and who served as Attorney General for his nation— did not have control of the organization running his campaign either directly or through persons in his confidence and of his choosing. In the words of the Committee's own Finance Director, Governor Thornburgh was "ultimately in control" of the campaign.

Richard Thornburgh did not, however, tell Rove, or anyone else, he intended to be liable to Rove for any debt incurred by any person with regard to Rove's services to the Committee.[8] Nor did Murray Dickman affirmatively represent to Rove that Thornburgh would be responsible for any unpaid amounts owed Rove by the Committee.

## C. *Murray Dickman's Role as Thornburgh's Agent*

At all times relevant to the issues in this cause, Murray Dickman acted as Thornburgh's general agent with regard to Thornburgh's political affairs.

In addition to being Thornburgh's Assistant while Thornburgh was Attorney General, Dickman held the position of Deputy Executive Assistant to Thornburgh when Thornburgh was Governor of Pennsylvania, served on Governor Thornburgh's Cabinet, and played an active role in the organization of all but one of Thornburgh's campaigns for political office since 1978. When Senator Phil Gramm sought to encourage Thornburgh to run for the Senate, he called Dickman to influence Thornburgh.

Dickman not only took part in the initial negotiations with Rove and sent Rove Thornburgh's signature and lists of addresses, but he also took part in the Committee's decision to hire Michele Davis as Campaign Manager. During the campaign, Dickman assisted Thornburgh in the determination of broad strategies, such as where to speak and what issues to address. Dickman received proposed fund-raising letters drafted by Rove from Bob Mason, Finance Director for the Thornburgh for Senate Committee, reviewed them "for factual errors," sent them to Thornburgh for final approval, and then sent the final copies with changes back to Rove via Mason.

According to the Thornburgh for Senate Committee, Dickman was the primary point of contact between the Committee and Thornburgh. Plaintiff's Exhibit 111 (Defendant Thornburgh for Senate Committee's Response to Plaintiff's 1st set of Interrogatories). The Committee listed Dickman as one of the people involved in the decision to employ Rove and whether or not to pay Rove and listed him as a person authorized to make decisions with respect to receipt or expenditure of campaign funds. Plaintiff's Exhibit 111, 112, 113 (Defendants' Responses to Plaintiff's 1st set of Interrogatories). Finally, when questioned by this judge, Dickman conceded that he was known as "an intermediary" through whom people could reach Thornburgh "in some matters," including the running, and organization, of Thornburgh's campaign for Senate.

The evidence is undisputed—anyone who knew anything, knew Dickman was Thornburgh's spokesperson. Nonetheless, Thornburgh and Dickman have maintained throughout this litigation that Thornburgh never authorized Dickman, any member of the Committee, or the Committee itself to be Thornburgh's agent during or before the 1991 campaign for the Senate. That is simply not credible. Thornburgh authorized Murray Dickman to speak and act on his behalf with respect to his 1991 campaign for the Senate or, at the very least, knowingly

---

8. Karl Rove's only actual contact with Richard Thornburgh took place in September, 1991, when Rove accidentally ran into Thornburgh in an airport and introduced himself to Thornburgh, who told Rove he was doing a good job and to keep up the good work.

allowed Dickman to perform acts which any reasonable vendor would interpret to mean Dickman was Thornburgh's agent.

### D. Renegotiation of the August 7, 1991 Contract and Creation of the September 18, 1991 Contract

In early September, Murray Dickman and Michele Davis decided they wanted to renegotiate the August 7, 1991 agreement with Rove and wanted Bob Mason to be their "go-between." On September 9, 1991, Mason sent a memorandum to Rove, Davis, and Dickman, listing the changes requested. Plaintiff's Exhibit # 66. Amongst other things, the proposed revisions required Rove charge only 3 cents for each letter mailed and pass on any discounts to the Committee. In addition, Michele Davis and Bob Mason were to be the designated representatives of the Committee. *Id.*

Initially, Rove objected to the reduction in price per letter, saying that "[o]ur June 24 proposal was 4.5 [cents] and that was *accepted then by Murray [Dickman].*" *Id.* (emphasis added). However, on September 16, 1991, after negotiating for several days, Rove, although still dissatisfied with the 1.5 cent per letter reduction in price, acceded to the Committee's requests and submitted a modified contract, dated September 18, 1991, with the Committee's proposed changes incorporated. *Id.* Upon receipt, Mason sent the contract, already signed by Rove, to Dickman for his signature.[9] This agreement was also apparently never executed by Thornburgh, Dickman, or any representative for the Committee. Still, on September 22, 1991, payments to Rove resumed and were made according to the terms of the September 18, 1991 modifications.

### E. Services Provided by and Payments Made and Owed to Rove

Rove submitted its first invoice, in the amount of $1,148.15, to Dick Thornburgh "c/o Murray Dickman" at Dickman's home address on July 31, 1991. The invoice reflected Rove's bill for "miscellaneous" services in connection with the preliminary stages of the direct mail campaign. Plaintiff's Exhibit 9. Michele Davis approved payment of this invoice on August 20, 1991, and on August 22, 1991 the Committee issued a check for that amount to Rove. *See id.; see also* Trial Stipulation # 5. On August 15, 1991, Rove submitted a "prebilling" invoice in the amount of $37,618.11 for services performed and costs associated with the mailing of the first fund-raising letter. Plaintiff's Exhibit 83. This invoice was addressed not to Thornburgh, but to "Thornburgh for Senate," and was again sent "c/o Murray Dickman." *Id.* Presumably, the Committee's August 23, 1991 payment of $12,236.00, its September 5, 1991, payment of $15,000.00, and its September 17, 1991 payment (by wire) of $40,000.00 covered Rove's final bill of $29,768.78 [10] for this first project. *See* Trial Stipulation # 5; *see also* Plaintiff's Exhibit # 83. All invoices issued thereafter by Rove were addressed to "Thornburgh for Senate c/o Ray Dimuzio." Plaintiff's Exhibit # 83. All payments to Rove, including payment of the July 31, 1991 invoice, were drawn from the Committee account.

Following the renegotiation of the August 7, 1991 Agreement, on September 17 and 18, 1991, Rove issued credit memos on the bills for the first four direct mail packages, crediting 1.5 cents per piece mailed and crediting the 15% markup for work that Rove contracted to be performed by third parties. *See id.* (for instance, one invoice, dated September 17, 1991, is for Project # 5449 and, with respect to that project, credits the Com-

---

9. Defendants were apparently unable to locate the September 18, 1991 contract signed by Rove, but Bob Mason testified he recalled seeing the contract and it was signed by Rove. An unsigned copy of that contract in evidence called for the signature of Murray Dickman on behalf of the Committee. There is no evidence the parties discussed this; however, it does emphasize Rove believed Murray Dickman was calling the shots for Thornburgh in the campaign.

10. By September 18, 1991, the total bill for the first letter had been reduced to $29,768.78 because of lower overall actual expenses and because on September 17, 1991, Rove issued a credit of $1833.58 following renegotiation of the contract.

mittee with $1600.98, representing industry discounts passed on to the Committee and the lower price per letter); *see also* Trial Stipulations # 6. Thereafter, Rove billed the Committee according to the terms of the September 18, 1991 modifications. The Committee continued to request services from Rove, and, when it paid Rove, the Committee paid according to the terms of the September 18, 1991 contract. Beginning in late September, 1991, however, the Committee stopped paying Rove for much of its work performed, choosing instead to spend available funds on "last minute" television commercials and other efforts to increase Thornburgh's chances of being reelected.

Following the election, which Thornburgh lost, Rove, at the request of Ray Dimuzio, prepared and mailed 16,306 copies of a letter, dated "Thanksgiving Day," asking for money to reduce the debt incurred by the Committee, and which "[Thornburgh] must shoulder." Plaintiff's Exhibit # 3S. Thornburgh approved this particular letter, but later rejected a second debt retirement letter. Michele Davis also sent a debt retirement letter, but no further efforts to raise money were made.

The parties do not dispute the existence of an agreement between the Committee and Rove. Nor do the parties dispute the services performed by Rove were requested by the Committee and billed correctly. In fact, Bob Mason confirmed that all work performed by Rove was requested and authorized and the charges correct. Plaintiff's Exhibit # 6 (January 14, 1992 Memorandum from Bob Mason to Ray Dimuzio). The parties further stipulated to the amount of the payments received by Rove and the amount billed which remains unpaid. *See* Plaintiff's Exhibit # 6; Trial Stipulations # 2, # 3. Rove's total bill for its direct mail services was $384,151.51. Trial Stipulations # 2. The Committee paid Rove $214,419.03, leaving unpaid $169,732.48. *Id.* # 3, # 4, # 5. Rove also billed the Committee for interest, as stated in the August 7 proposed agreement and September 16 contract, at 18% per annum for a total charge of $5242.66 in interest. Defendants do dispute this charge, arguing that the rate of interest charged is usurious under Texas law.

As of, and including, September 18, 1991, Rove had billed the Committee for six projects in the amount of $97,548.97 and miscellaneous services in the amount of $26,395.72 for a total of $123,944.69, which includes adjustments for the credit issued by Rove on September 17 and 18, 1991. *See* Plaintiff's Exhibits # 82, # 83. As of September 28, 1991, the date payments for any invoices issued on September 18, 1991 would be due, the Committee had paid Rove $123,944.69. Trial Stipulations, # 5. Thus, all bills issued prior to Rove's acceptance of the Committee's terms and creation of the final contract between Rove and the Committee were paid by the Committee.

Overall, Rove mailed 28 projects consisting of 695,094 letters, mailed throughout the nation, and provided various other materials and services related to the campaign. *See id.* # 1. In response to direct mail projects, the Committee received $773,321.35 total, and $426,385.94 net after subtracting the billings of Rove. *Id.* # 7. Rove mailed 11,440 solicitation letters to Texas residents, 306 of whom responded and contributed a total of $83,034.00. All the money received by the Committee was used exclusively to operate Thornburgh's campaign for the Senate.

### III. LEGAL ANALYSIS

Before reaching the merits of Rove's claims against Thornburgh, Dimuzio, and the Committee, the Court must determine whether it has personal jurisdiction over each of the defendants and what law to apply to the various claims. Unfortunately, the facts of this case do not lend themselves to neat or orderly analysis, and some of the considerations necessary to determine jurisdiction and choice of law are inextricably intertwined with considerations necessary to determine liability. With that preamble, the Court will proceed to determine the jurisdictional issues, then choice of law, and finally the liability of the defendants over which it has jurisdiction with as little overlap as possible.

#### A. *Personal Jurisdiction*

**1. The Thornburgh for Senate Committee**

■ There is no question the Court has personal jurisdiction over the "Committee."

In Texas, "[i]t is [ ] now firmly established that the Texas Long–Arm Statute, Tex.Rev. Civ.Stat.Ann. art. 2031b (Supp.1985), 'reaches as far as the federal constitutional requirements of due process will permit,' at least insofar as acts which may constitute 'doing business' are concerned." *Beechem v. Pippin,* 686 S.W.2d 356, 358 (Tex.App.—Austin 1985, no writ) (citations omitted). Personal jurisdiction over a nonresident defendant meets due process requirements if the defendant has affirmatively acted to establish minimum contacts with the state and if it would not be unfair or unreasonable to require the defendant to defend the suit in the foreign state. *Southwest Offset, Inc. v. Hudco Pub. Co., Inc.,* 622 F.2d 149, 152 (5th Cir.1980).

■ In the Fifth Circuit, a non-resident defendant "is considered to have purposefully availed itself of the privilege of conducting activities within the forum if it was reasonably foreseeable that [the] resident plaintiff[ ] would in fact perform a material part of its contractual obligations within the forum state." *Mississippi Interstate Express v. Transpo, Inc.,* 681 F.2d 1003, 1008 (5th Cir. 1982). In this case, not only did the Committee, through its agents,[11] enter into an agreement with a Texas corporation which it knew would perform all of its services in the State of Texas, but its agents requested services from Rove & Co., by phone and letter, on a regular basis throughout the summer of 1991; sent payments to Rove & Co. in Texas; and renegotiated their agreement with Rove & Co., by phone and letter, in Texas. The Committee also received drafts of letters from Rove & Co. and returned marked-up copies to Rove & Co. in Texas. In the words of the Fifth Circuit Court of Appeals, the Committee was "no mere passive customer," but was actively involved in the direct mail services it hired Rove to perform.[12] *See Southwest Offset,* 622 F.2d at 152. Such

actions by the Committee are sufficient to establish minimum contacts with the State of Texas as the lawsuit arose out of those very transactions, and the Committee could reasonably have foreseen being brought into a Texas court as a result thereof. This Court has jurisdiction over the Thornburgh for Senate Committee.

### 2. Richard T. Thornburgh

■ This Court also has personal jurisdiction over Richard Thornburgh. As discussed above, this Court has no doubt Thornburgh gave Murray Dickman actual authority to act as his agent with respect to his 1991 campaign for the Senate. At the very least, Dickman had apparent authority to act on Thornburgh's behalf with respect to the campaign and, specifically, the agreement with Rove. *See supra* pp. 666–667; *see also e.g., Hunt v. Davis,* 387 So.2d 209, 212 (Ala.Civ. App.1980) (where candidate "passively permit[ted]" campaign manager to appear to third persons as though he had authority to act on candidate's behalf, apparent agency existed); *see also Parker v. Junior Press Printing Serv.,* 266 Md. 721, 729, 296 A.2d 377, 381 (1972). For example, Thornburgh knew persons interested in his running for the Senate were dealing with Dickman and used Dickman as an intermediary and front man; Thornburgh knew Dickman requested his signature and personal mailing lists for the purpose of having fund-raising letters mailed out by a direct mail company for his campaign; and Thornburgh knew the Committee kept in contact with him primarily through Dickman.

Murray Dickman was Richard Thornburgh's agent and was acting as such when he accepted the original agreement with Rove. Dickman sent mailing lists and Thornburgh's signature exemplar to Rove in

**11.** As discussed later, the Thornburgh for Senate Committee is an unincorporated political association. Unincorporated associations are subjected to jurisdiction by the acts of its members or agents if such acts are performed on behalf of the association. *See Donatelli v. Nat'l Hockey League,* 893 F.2d 459, 469 (1st Cir.1990).

**12.** The fact that Rove solicited the Committee's business in Washington, D.C. might have been relevant to a finding of no jurisdiction in other

circumstances, but where, as here, the defendant places several orders with the plaintiff in the forum state and/or exercises significant control over the plaintiff's provision of services, such a fact is overshadowed, and jurisdiction may be maintained. *See Southwest Offset,* 622 F.2d at 151–52 (plaintiff initially contacted nonresident defendant); *Transpo,* 681 F.2d at 1005, 1008–10 (same).·

Texas. Dickman knew Rove was a Texas corporation and would perform its services to the campaign in Texas. Dickman received drafts of letters from Rove, gave them to Thornburgh for review, and returned the drafts with Thornburgh's changes to Rove in Texas. Thus, for the reasons enumerated above with respect to the Committee, this Court has personal jurisdiction over Thornburgh because of the acts of his agent Dickman. *See Ross F. Meriwether & Associates, Inc. v. Aulbach*, 686 S.W.2d 730, 731 (Tex. App.—San Antonio 1985, no writ) (agents' acts on behalf of principal, which constitute doing business in state, subject principal to personal jurisdiction in state).

### 3. Ray Dimuzio

■ The issue of personal jurisdiction over Defendant Ray Dimuzio is more complicated. In most instances, an agent is not liable for acts done on behalf of a principal and is not considered to be doing business in a foreign state when such business is done on behalf of a principal. *See id.* However, the law with respect to unincorporated political associations differs somewhat.[13] The law of most jurisdictions is that an unincorporated campaign committee is considered an

> unincorporated political association[ ], not designed for purposes of trade or profit, fastening pecuniary liability on individual members . . . only by reason of the acts of such individuals or of their agents. . . . and only those members who authorize or ratify the transaction are liable.

*Hunt*, 387 So.2d at 211. Thus, to the extent Dimuzio, as treasurer of the Committee, authorized or ratified transactions with Rove, he could potentially be liable despite the fact he acted only as an agent of the Committee. *See e.g., Victory Comm. v. Genesis Conven-* tion Ctr., 597 N.E.2d 361, 364–65 (Ind.Ct. App.1992) (treasurer of campaign committee liable for Committee's debts if assented to contract). It follows then that, to the extent Dimuzio was found to have authorized, assented to, or ratified transactions between Rove and the Committee, the rule that an agent is not subject to personal jurisdiction for acts performed on behalf of his principal would, similarly, fall to the wayside, and Dimuzio could be subject to this Court's jurisdiction on the basis of such actions.

■ Thus, this Court must look to see if Dimuzio performed any actions which could subject him to liability, and, in turn, this Court's jurisdiction.[14] As treasurer, Dimuzio's primary responsibility was to assure compliance with federal election laws and disburse funds. The only transactions which Dimuzio authorized, or otherwise assented to, were his orders of stationary for the Committee, the Thanksgiving letter, and his issuance of a $50,000.00 check to Rove after the election.[15] However, Dimuzio could not be found liable to Rove for any of these transactions as Rove was paid for the stationary and Thanksgiving letter ordered by Dimuzio and, obviously, should have nothing to complain about with regard to Dimuzio's issuance of the $50,000.00 check.

Because Dimuzio can, under no circumstances, be found personally liable to Rove for any actions he took as treasurer of the Committee and has not otherwise performed any acts to establish minimum contacts in Texas,[16] there is no basis upon which this Court can assert personal jurisdiction over him.

### B. *Choice of Law*

■ "[E]xcept those contract cases in which the parties have agreed to a valid

---

**13.** As discussed below, the issue of which state's law to apply with respect to the issues of what the Committee is and who may be liable for its debts is largely irrelevant as almost all jurisdictions have treated such committees in the same manner. *See Hunt*, 387 So.2d at 211.

**14.** Such a determination of factors otherwise reserved for consideration of *the* merits is permissible when a preliminary determination of personal jurisdiction is not otherwise possible. *Meriwether*, 686 S.W.2d at 732.

**15.** Dimuzio's signing and issuance of Committee checks to Rove for payment of services ordered by others authorized to do so does not prove, or even suggest, that Dimuzio assented to or ratified those transactions. *See Bloom v. Vauclain*, 329 Pa. 460, 463, 198 A. 78, 79 (1938).

**16.** Recall, Dimuzio is a resident of, and works in, Pittsburgh, Pennsylvania.

choice of law clause, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414, 421 (Tex.1984); *see also Maxus Exploration v. Moran Bros.*, 817 S.W.2d 50, 53 (Tex.1991). Thus, with respect to Rove's breach of contract claims and the Defendants' usury claims, the Court must first determine if there exists a contract between the Committee and/or Thornburgh and, if so, whether the parties to that contract agreed which law would govern the contract. *See id.;* Restatement (Second) of Conflict of Law §§ 187–188 (1971) (adopted by Texas Supreme Court in *Gutierrez v. Collins,* 583 S.W.2d 312 (Tex.1979), *Duncan,* 665 S.W.2d at 420).[17]

■ The parties do not dispute that the Committee entered into a contract for direct mail services with Rove. Because all of Rove's invoices submitted through September 18, 1991, were paid by the Committee, the contract signed by Karl Rove on that day is the only contract or agreement the Court need examine. Although that contract may never have been executed by Dickman or a representative of the Committee and returned to Rove, it nonetheless constituted a binding contract between Rove and the Committee. As apparent from the exchange of memoranda between Karl Rove and Bob Mason, and as testified to by Bob Mason, the September 18 contract reflected the final agreement between the parties, and the Committee accepted the contract by continuing to request services from Rove and reap the benefit therefrom. *See Augusta Dev. Co. v. Fish Oil Well Serv. Co., Inc.,* 761 S.W.2d 538, 544 (Tex.App.—Corpus Christi 1988, no writ) ("in order to constitute a contract in writing, a writing does not necessarily have to be signed by both parties, so long as the party not signing accepts the contract by his acts, conduct, or acquiescence").

■ Paragraph 10 of the September 18, 1991 contract expressly provides the "Agreement is made, to be performed, and shall be construed in accordance with the laws of the State of Texas...." Plaintiff's Exhibit # 66 (September 18, 1991 Contract). Thus, Texas law governs the "contractual rights and duties" of the parties to the contract. *See Maxus,* 817 S.W.2d at 53; Restatement (Second) of Conflict of Law § 187 (1971).

Although only the Committee is a "party" to the contract, if Thornburgh is found liable for the Committee's debt under the contract, the extent of his liability and the usury claims will be determined, in large part, by examining the contract. Therefore, the only issue subject to "the most significant relationship" test is the initial determination of whether or not Thornburgh may be held personally liable for the contractual debt as the contract is silent on that issue.

Whether or not a candidate running for a Pennsylvania Senate seat may be liable for a debt entered into by his principal campaign committee, created in and based in Pennsylvania, is in all likelihood an issue better decided according to Pennsylvania law; however, the answer is largely irrelevant in this case. All parties agree, with regard to the issue of Thornburgh's personal liability, the outcome will be the same whether Texas or Pennsylvania law is applied. *See* Plaintiff's Post–Trial Brief, at 7 n. 6 (April 9, 1993) ("the outcome of the personal liability issues in this case do not depend on any differences between the laws of Texas and Pennsylvania"); Defendants' Post Trial Brief, at 12 (April 21, 1993) (the two Texas cases Defendants' cite as having precedential value,[18] "state the same rule as that followed in Pennsylvania"). As both Texas and Pennsylvania state the majority rule regarding the liability of candidates, officers, and/or members of an unincorporated campaign commit-

---

**17.** Because the Court finds Thornburgh liable for the debt incurred by the Committee under the written contract, it need not address Rove's claims based on *quantum meruit.* Furthermore, Rove did not put on evidence, or otherwise ar-

gue, with regard to its claim of fraud; therefore, the Court will not consider that issue either.

**18.** *Hutchins v. Grace Tabernacle United Pentecostal Church,* 804 S.W.2d 598 (Tex.App.—Houston [1st Dist.] 1991, no writ) and *Cox v. Thee Ever-*

tee,[19] the Court will apply that majority rule and examine cases from various states applying that rule.

## C. *Liability*

■■■ As the parties do not dispute the Committee's liability, *see* p. 13, *supra*, and the Court has determined it has no jurisdiction over Dimuzio, the only liability issue before the Court is whether Richard Thornburgh may be held liable for the Committee's debt to Rove. The Committee is undoubtedly a voluntary unincorporated political association[20]; therefore, because Thornburgh did not expressly assume liability on the contract between Rove and the Committee, the precise question before this Court is: did Thornburgh, personally or through his agent Dickman, authorize, assent to, or ratify the September 18, 1991 contract between Rove and the Committee? *See e.g., FDIC v. Morrison*, 816 F.2d 679, at *3 (6th Cir.1987) (unpublished disposition, text in WESTLAW); *Reading Co. v. City of Philadelphia*, 1992 WL 392595, at *7 (E.D.Pa. Dec. 17, 1992) (officers or members of unincorporated association liable for acts individually commit, authorize, ratify, or to which they contribute); *Hutchins v. Grace Tabernacle U.P. Church*, 804 S.W.2d 598, 599 (Tex.App.— Houston [1st Dist.] 1991, no writ) (members of an unincorporated association become liable for contract debts of association if they assent to or ratify contract); *Collins v. Williamson Printing Corp.*, 746 S.W.2d 489, 493 (Tex.App.—Dallas 1988, no writ) (because jury found candidate for U.S. Senate had authorized campaign committee "to incur a debt to [printing company]" and appellant had not supplied statement of facts to court, court found committee became Collins' agent

and Collins was personally liable); *Hunt*, 387 So.2d at 211 (candidate liable for campaign committee debt "only by reason of the acts of such individuals or of their agents; . . . only those members who authorize or ratify the transaction are liable"); *Wortex Mills v. Textile Workers Union of Am., C.I.O.*, 380 Pa. 3, 18, 109 A.2d 815, 822 (1954) (same); *Bloom v. Vauclain*, 329 Pa. 460, 463, 198 A. 78, 79 (1938) (members of unincorporated campaign committee liable for committee debt if they make, authorize, assent to, or ratify contract).

The answer is yes. The Court finds from a preponderance of the evidence Richard Thornburgh did assent to the September 18, 1991 contract between Rove and the Committee.

Assuming Thornburgh's testimony that he played no part in the hiring of Rove or negotiation of the contract between Rove and the Committee is accurate, Thornburgh nonetheless clearly knew Dickman had hired some person or company to provide direct mail services designed to raise money for his campaign. In fact, Thornburgh played a direct role in the fulfillment of that contract. Thornburgh gave his signature exemplar to his agent Dickman knowing it would be affixed to fund-raising letters. Thornburgh reviewed drafts of letters, given to him by Dickman, made changes, and sent the revised drafts back to Rove via Dickman, indicating he approved of the form of the letters, which were written as if he were the writer. He provided lists of persons to Rove for the specific purpose of sending these letters of solicitation to thousands of people. In his testimony, Thornburgh acknowledged that he understood the letters he reviewed were

---

*green Church*, 836 S.W.2d 167, 170 (Tex.1992). *See id.*

**19.** *See Hunt*, 387 So.2d at 211; *see also supra* p. 671.

**20.** Rove argues the Committee is not an entity at all, but rather merely a conduit by which Thornburgh raised money to fund his campaign. Rove cites a case out of Illinois in support of its argument that the Committee is, in reality, a sole proprietorship. *See Progress Printing Corp. v. Jane Byrne Political Comm.*, 235 Ill.App.3d 292, 313, 176 Ill.Dec. 357, 371, 601 N.E.2d 1055,

1069 (Ill.App.Ct.1992), appeal denied, 148 Ill.2d 653, 183 Ill.Dec. 31, 610 N.E.2d 1275 (1993). The facts of that case, however, are very different than those presented here. In *Progress*, the candidate was the chairman of her campaign committee; she signed the committee's checks; she was in charge of the campaign; and she initiated the transactions with the plaintiff printer. *Id.* If this Court followed Plaintiff's reasoning, there would be few, if any, unincorporated political associations formed under the Federal Election laws which could not be classified as sole proprietorships, a result not contemplated by Congress nor the majority of courts in this country.

written on his behalf and that his approval meant somebody had the authority to mail these letters out to the public. He knew the money raised with these letters was, in fact, used for the sole purpose of seeking his reelection. Furthermore, Thornburgh admitted he had the authority, if he desired, to put an end to these fund-raising efforts. These facts establish that Thornburgh "assented" to the contract between Rove and the Committee.[21]

Defendants attempt to distinguish Thornburgh's participation from that of other candidates by emphasizing the fact Thornburgh had only one chance encounter with Rove at an airport and did not otherwise have any direct contact with Rove. *See e.g., Parker v. Junior Press Printing Serv., Inc.*, 266 Md. 721, 727, 296 A.2d 377, 380 (1972) (candidate's campaign manager and agent entered into agreement with printer for services, and candidate inspected proofs at printer's establishment on two occasions); *Progress Printing*, 235 Ill.App.3d at 313, 176 Ill.Dec. at 371, 601 N.E.2d at 1069 (candidate initiated contact with printer). Defendants also emphasize the fact Thornburgh did not expressly authorize the contract. *See e.g., Hunt*, 387 So.2d at 210 (candidate told campaign manager "to go ahead" with plan to solicit loans to pay for mass mailing of fund-raising literature and later "read and approved" of proofs of brochures).

This Court, however, can find no appreciable difference between a candidate reviewing letters for approval at the printer's place of business or in his own office. *Cf. Parker*, 266 Md. at 727, 296 A.2d at 380. Nor does the fact Thornburgh expressed his assent by actions diminish its effect. Given his knowledge of the direct mail fund-raising campaign, his control over the substance of the fund-raising letters, and his authority to re-

fuse to allow his signature to appear on any letter or to refuse to allow any letter to be mailed, Thornburgh did effectively say "go ahead" with the direct mail campaign. *Cf. Hunt*, 387 So.2d at 210.

Defendants also emphasize the fact Thornburgh never intended to incur personal liability.[22] However, as an Indiana Court of Appeals succinctly stated,

[t]he issue is not [ ] whether [the candidate or treasurer] *agreed* to become personally liable for the debts of the Committee. Rather, the issue is whether they *assented* to the contract. If so, they become personally liable by operation of law.

*Victory*, at 364 (emphasis added). Thornburgh assented to the contract and is personally liable for the debt owed by the Committee to Rove.

Even if Thornburgh's actions had been insufficient to establish his assent, he would still be personally liable as a result of Murray Dickman's authorization of, and assent to, the contract. As discussed above, Dickman was Thornburgh's agent and was Thornburgh's primary point of contact with the Committee. Dickman participated in the initial decision to hire Rove. Dickman testified that, at times, he discussed with Bob Mason, Finance Director, services to be ordered from Rove.

According to Mason, *Murray Dickman* and Michele Davis were the ones who authorized him to act as the "go-between" when they wanted to renegotiate the agreement with Rove. This testimony is corroborated by Mason's September 9, 1991 memorandum initiating the renegotiation with Rove, which was sent to Karl Rove, Michele Davis, and *Murray Dickman*; Rove's September 12, 1991 memorandum responding to Mason's

---

**21.** The fact that Thornburgh did not review each letter does not mean he approved the contract with respect to only those letters he actually reviewed. Even a cursory glance through the 28 different projects, consisting of a total of 695,094 letters, reveals there was very little variation in the different form letters, with the same vignettes and appeals appearing again and again, except for the Thanksgiving debt retirement letter, which Thornburgh reviewed and approved. *See* Plaintiff's Exhibit # 3. Thus, once Thornburgh had approved the content and language of a

given story or statement attributed to him, there would be no need for him to review subsequent letters reincorporating the same substance.

**22.** At trial, Thornburgh testified that, although he reviewed and approved the "Thanksgiving Day" letter, which states, *inter alia*, "I know I must shoulder most of [the debt," he did not intend by this approval to incur personal liability or lead anyone to believe he was personally liable.

memorandum with copies to Michele Davis and *Murray Dickman;* Mason's September 16, 1991 memorandum to Karl Rove with copies to Michele Davis and *Murray Dickman;* and Rove's September 16, 1991 memorandum to Mason with copies to Michele Davis and *Murray Dickman.* *See* Plaintiff's Exhibit # 66 (emphasis added). Had Dickman found any portion of the contract negotiations or the final contract objectionable, this Court has little doubt he would have made his disapproval known and had the authority to dictate the terms acceptable to the Committee and to Thornburgh.[23] Later, when Rove inquired about the Committee's intent, or lack thereof, to pay for services, he spoke with Dimuzio, Davis, Mason, and Dickman, and none of them challenged the existence of the contract or the amounts charged.

The Court did not find either Dickman or Thornburgh's testimony to be particularly credible.[24] Dickman's role in the Committee was obviously to assure Thornburgh's interests would be best served and to be Thornburgh's voice. The Court finds from a preponderance of the evidence Dickman not only participated in the making of the initial contract with Rove, but also participated, albeit behind the scenes, in the renegotiation of that contract. In the alternative, the Court finds Dickman assented to the final contract of September 18, 1991 as evidenced by his awareness of the proposed terms being exchanged by Rove and Mason during the contract renegotiations and as evidenced by his failure to contest Rove's right to be paid under the terms of that contract, especially as all persons involved knew Dickman spoke for Thornburgh.

The Court, thus, finds Thornburgh personally liable for the Committee's debt to Rove for the additional reason that Dickman's authorization of, and assent to, the final contract is imputed to him.

### D. *Usury*

 In their counterclaims, Defendants allege the interest demanded by Rove is usurious. Because the Court has found the September 18, 1991 contract to be in effect between Rove and the Committee and has found Thornburgh liable for the Committee's debts incurred under that contract, the provisions therein apply as does Texas law.

Article 5069–1.04 of Texas' Revised Civil Statutes provides, in part,

> The parties to any written contract may agree to and stipulate for any rate of interest ... that does not exceed ... 18 percent a year.[25]

Tex.Rev.Civ.Stat.Ann. art. 5069–1.04(a), (b) (Vernon 1987). Section 3. G. of the September 18, 1991 contract states

> Any amounts not paid by either party to the other when due shall bear interest at the rate of 18% per annum from the date it was due until paid or at the highest lawful rate allowed, whichever is lower.

Plaintiff's Exhibit # 66. Thus, the amount of interest charged by Rove is not usurious under Texas law. *See Augusta,* 761 S.W.2d at 542, 544–45 (provision in contract providing for 18% interest per annum applied and was not usurious as the party alleging usury, although he did not sign the contract, had accepted the contract by his acts).

**23.** Dickman signed the verification attached to the Committee's Responses to Plaintiff's First Set of Interrogatories as the "duly authorized agent of The Thornburgh for Senate Committee," and swore those answers were "within his personal knowledge and [ ] true and correct." Plaintiff's Exhibit # 111. Recall, amongst other things, Dickman, on behalf of the Committee, stated he participated in the decision to employ Rove; he participated in the decision of whether to pay, or not pay, Rove; and he was one of the persons authorized to make decisions concerning expenditure of campaign funds. *Id.*

**24.** The Court regrets this finding as it has the utmost respect for Governor Thornburgh, a man who on his own merit has risen to the governorship of his home state and office of the Attorney General of the United States.

**25.** Actually, if the amount of interest computed under sections (a)(1), (a)(2), or (c) is less than 18 percent a year, the ceiling under that provision is 18 percent a year, but if the amount computed under one of those sections is more than 24 percent a year, the ceiling is 24 percent a year. Tex.Rev.Civ.Stat.Ann. art. 5069–1.04(b)(1) (Vernon 1987).

## IV. CONCLUSION

Defendants The Thornburgh for Senate Committee and Richard Thornburgh are liable to Plaintiff Karl Rove & Company for the contract debt incurred. The Committee and Thornburgh are thus jointly and severally liable to Rove in the amount of $169,732.48, the difference between the amount the Committee paid to Rove and the amount billed; $5,215.74, billed interest at the rate of 18% per annum on the amounts unpaid through December 31, 1991; and $44,529.73, billed interest at the rate of 18% per annum ($83.70 per day) on the unpaid principal amount unpaid from January 1, 1992, through the date of judgment in this case. In addition, as provided for in the contract, the Committee and Thornburgh are jointly and severally liable for Rove's reasonable attorneys' fees, which the parties have stipulated to be $75,-000.00. *See* Plaintiff's Exhibit # 66; Trial Stipulations, no. 9; Second Trial Stipulations, no. 1, 3.

Judgment will be entered accordingly.

## JUDGMENT

In accordance with the Court's Memorandum Opinion and Order, filed on this the 16th day of June, 1993, the Court enters the following final judgment in the above-styled and numbered cause:

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that Defendants The Thornburgh for Senate Committee and Richard Thornburgh are jointly and severally liable to Plaintiff Karl Rove & Company for the difference between the amount the Committee paid to Rove and the amount billed, $169,732.48; billed interest at the rate of 18% per annum on the amounts unpaid through December 31, 1991, $5,215.74; billed interest at the rate of 18% per annum ($83.70 per day) on the unpaid principal amount from January 1, 1992, through the date of judgment, $44,529.73; and postjudgment interest at the rate of 3.54% from the date of the entry of this judgment, pursuant to 28 U.S.C. § 1961.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that Defendants The Thornburgh for Senate Committee and Richard Thornburgh are jointly and severally liable to Plaintiff Karl Rove & Company for its reasonable attorneys' fees, which the parties have stipulated to be $75,000.00.

IT IS, THEREFORE, FINALLY ORDERED, ADJUDGED AND DECREED that Plaintiff Karl Rove & Company do have and recover from Defendants The Thornburgh for Senate Committee and Richard Thornburgh, jointly and severally, judgment in the amount of $219,477.95; plus postjudgment interest at the rate of 3.54%; plus $75,000.00 in attorney's fees, for which let execution issue.